Mr. Justice GRIER,
delivered the opinion of the court.
The great question of the case is, whether the Boyden machine infringes the patent originally granted to Wells for his invention; and if not, whether his assignees, by the use or abuse of the right to surrender and reissue their patent, can so expand it as to cover by ex post facto operation, all subsequent inventions.
The original patent to Wells purports to be for “anew and useful improvement in the machine for making hat-bodies.” His specification recites that “it had long been essayed to make hat-bodies by throwing the fibres of wool, &e., by a brush or picker on a perforated cone exhausted by a fan below, to carry and hold the fibres thereon; that all these contrivances were defective.” He alleges that he has improved this machine so as to remove all the objections, as proved by the test of experiment. “ My improvement,” he says, “ consists in feeding the fur between two endless belts, &c., which present it to the action of a rotating brush, which moving at a great velocity throws it in a chamber or tunnel, which is gradually changed in form towards the outlet, where it assumes the shape nearly corresponding to a vertical section passing through the axis of the cone, this casing being provided with an aperture, immediately under the brush, through whicn a current of air enters,” &c. The aperture of the chamber or tunnel is provided with a bonnet or hood hinged thereto, and at the bottom with a hinged flap.
Beside the machine thus described, he includes a claim *567 also for a process which consists in covering the bat before it is removed with felted fulled cloth, &e. As our present concern is with the machine, we need not describe the process more particularly.
The patentee very properly does not claim to have first invented the art of making hats on exhausted cones, but to have improved the machinery or devices used for this purpose, in important particulars. After properly describing the several devices, the combination of which compose his improved machine, he limits his claim in exact conformity with such description. He says: “What I claim as my invention, and desire to secure by letters patent, in the machinery above described, is the arrangement of the two feeding-belts with their planes inclined, &c., substantially as described, in combination with the rotating brush and tunnel placed in front of the aperture or mouth thereof, substantially as described. I claim the chamber into which the fibres are thrown by the brush in combination with the perforated cone, &c. I also claim the employment of the hinged hood and providing the lower flap, for the purpose of regulating the delivery to increase the thickness of the bat, in combination with the hood.”
This patent was first surrendered in September, 1856, by the assignee, and separate patents taken for the machine and the process: the same operation of surrender and reissue was repeated in 1860. The specification of the machine patent of 1860 (No. 1087) describes the machine much as before, premising that, in 1846, William Bosket had obtained a patent for a machine in which the fibres to be formed into a' hat-body are drawn by suction through a tube into the lower part of a chamber surrounding a pervious cone, the inside of which is connected with an exhausting fan; but that liatbodies are required to be made thick at or near the brim, and thin along the crown, that the required strength may be given without making the hat too heavy.' The specification thus continues: “ The said mode of operation invented by said Henry A. Wells is embodied in the following description,” &c., and the claim is modified to suit this abstraction. “ What is *568 claimed herein as the invention of said Wells is forming bats of fur fibres by throwing the fur in properly regulated quantities, substantially as herein described
Itere we have the first experiment in the art of expansion by an equivocal claim, which may be construed a claim for the result or product of the machine, or for its principle or mode of operation. By this, construction another inventor may be frightened from the course. But when challenged in a court of justice as too broad, the words, “ substantially as herein described,” may be resorted to as qualifying this claim of a function, result, or principle, and arguing that as the specification described a machine, it meant nothing more.
Let us consider what was the original invention of Wells, as described and claimed by himself, without regard to this ingenious attempt by the assignee to expand it into an abstraction.
It is not within the category of those inventions which consist in a new application of certain natural forces to produce a certain result to which they had never before been applied, and which, when once pointed out, required no invention to construct devices for its application. Such inventions partake of the nature of discoveries, either found out by experiment or the result of a happy thought, which, when once expressed, is plain to all intelligent persons, who could point out at once many devices for making it effectual. Any one can perceive the difference of such a case from the invention of a labor-saving machine, which is a mere combination of certain mechanical devices to produce a desired manufacture in a cheaper or better manner. .The case of McLurg v. Kingsland* will serve to elucidate this peculiar sort of inventions.
A workman in a foundry observed, in pumping water into a bucket, that the water entering at a tangent to the circle of the bucket, acquired a circular motion, diminishing when it approached the centre, where bits of straw and other lighter *569 materials would be concentrated. In casting iron rolls, the metal required to have this rotary motion for the same purpose. This effect had previously been produced by stirring the liquid metal. The thought all at once struck the mindJ of this observer, that the application of this principle or law of nature might be beneficially made to the casting of rolls by merely introducing the metal at the bottom of the mould at a tangent. The thought being once suggested, it required no skill or invention to devise a plan for the application of the principle. This, though classed as an invention, partook more of the nature of a discovery. In that case the court say, “We find the invention consists solely in the angular direction given to the tube through which the metal is conducted into the cylinder in which the roll is cast. Every part of the machinery is old; the roll itself is no part of the invention.” And yet, it was a patentable invention or discovery, though it came not within the description of the statute, as “ a machine, manufacture, or composition of matter.”
It is plain that the invention of Wells had nothing of the nature of a discovery, or the new application of some power of nature to the perfection of an art or the operation of a machine, such as the application of the electro-galvanic fluid to the art of telegraphic writing. It was simply a concrete machine, an improvement on other known machines, and nothing more. Wells was not the first who discovered that bats of fur could be made on perforated cones by means of a vacuum or exhausted chamber. The patent to Williams, in 1833, was the first .great step towards applying those natural forces to labor-saving machinery in the art of hat-making.- He was the first to use the power of atmospheric pressure to deposit fur or fibrous materials on auy surface. He used a carding machine to disintegrate the fur or fibres; a revolving fan to thrort them on the cones; the hollow perforated cones or formers connected with devices for exhausting them; and the use of a hollow perforated cone to place over the bat, to retain it in position when removed from the exhaust. His drawing exhibited, as a substitute for a trunk *570 or conductor, a roof without side or bottom, in the shape of a pliable deflector.
Without particularly noticing the patent of Robertson, in 1838, or of Hezekiah Miller, in 1839, we may mention that of Bosket. It is dated in January, 1846. He used a bowstring moved by machinery, in place of the rotating picker used by others. He used what he describes as “ a suitable passage or tube which leads from the vicinity to what may be termed the forming or wind chamber.” We refer to these previous inventions, not to show that Wells’s improvement was not new or useful, but to show the state of the art, in order to properly appreciate the nature and extent of the invention of Wells.
The patent act grants a monopoly “to any one who may have discovered or invented any new and useful art, machine, manufacture, or composition of matter.”
That the invention of Wells comes within the category of a “ machine,” cannot be disputed. The law requires that the specification “ should set forth the principle and the several modes in which he has contemplated the application of that principle, or character by which it may be distinguished from other inventions, and shall particularly point out the part, improvement, or combination which he claims as his own invention or discovery.” We find here no authority to grant a patent for a “principle” or a “mode of operation,” or an idea, or any other abstraction. A machine is a concrete thing, consisting of parts, or of certain devices and combination of devices. The principle of a machine is properly defined to be “ its mode of operation,” or thatpéculiar combination of devices which distinguish it from other machines. A machine is not a principle or an idea. The use of ill-defined abstract phraseology is the frequent source of error. It requires no great ingenuity to mystify a subject by the use of abstract terms of indefinite or equivocal meaning. Because the law requires a patentee to explain the mode of operation of his peculiar machine, which distinguishes it from others, it does not authorize a patent for a “ mode of operation as exhibited in a machine.” Much less *571 can any inference be drawn from the statute, that au inventor who has made an improvement in a machine, and thus effects the desired result in a better or cheaper manner than before, can include all previous inventions, and have a claim to the whole art, discovery, or machine which he has improved. All others have au equal right to make improved machines, provided they do not embody the same, or substantially the same devices, or combination of devices, which constitute the peculiar characteristic of the previous invention.
The original patent of Wells has been more than once decided by the courts to be a valid patent. The specification states clearly and correctly what the invention is; what the patentee claims as his peculiar improvement on former machines; what are the devices, or peculiar combination of them, Avhich make it to differ, and the mode in AAdiicli they operate to produce the required result. He claims all he had a right to claim as neAV, and no more. There is no error from “ inadvertences, accident, or mistake.”
The aim and object of both Wells and Boyden was to construct an automatic machine which would distribute the fur on the cones so that the bat might be thicker on certain portions than on others. This was the defect of former machines, Avhich each proposed to remedy. Fosket, though he used a spout or tunnel, so constructed it that the croAvn of the hat Avas thicker where it ought to have been thinner. The great and peculiar characteristic of the Wells invention is a tunnel or chamber, constructed as described. Instead of the picker, he used a rotating brush to distribute the fur from the feed-aprons, and throw it forward into the chamber which conducted it to the cones. The hinged hood and flap Avere devices to distribute the material in unequal quantities, to accomplish the object of making the bat thicker in one part than another. This machine, although an improvement on its predecessors, Avas not automatic, although it professed to be such. It would not distribute the fur in proper proportions without the assistance of a skilful operator. But, finally, Messrs. Burr & Taylor, after much expense and labor, devised the plan of making this *572 chambei or trunk of thin sheet metal, regulated hy a movable top, so that the deposit of the fibres could be regulated by adapting the form of the delivery aperture to any size required.
Now, the machine of Boyden has not one of the peculiar devices, or combination, of devices, of the Wells machine, nor any substantial identity with it, unless by substantial identity is meant, every machine which produces the same effect. These abstract phrases, “ svbstantial identity,” “ equivalent,” “mode of operation,” &c., are often used in such a vague and equivocal manner, that they mystify and lead many to absurd conclusions, who will not distinguish between things that differ. That two machines produce the same effect, will not justify the assertion that they are substantially the same, or that the devices used by one are, therefore, mere equivalents for those of the other. There is nothing in the Wells machine or its devices which suggests the peculiar devi ce employed by Boyden. His machine has no tunnel, no cap, no flap, nor any equivalent therefor, nor does it incorporate in its structure the substance of the first invention. There .is nothing to be found in the specification of Wells which would ever suggest the peculiar device of the Boyden machine. As an improvement, it has more claim to originality than that of Wells. It is thus correctly described: “This invention relates to an improved mode of directing and guiding the fur, as hereinafter fully shown and described, whereby trunks and all other comparatively complicated appliances hitherto used for the purpose are dispersed with, and an exceedingly simple and efficient device substituted therefor. The invention consists in placing directly in front of the picker a plate so bent or curved that its surface will have a certain relative position with the axes of the picker and the surface of the cone, and give such a direction to the fur, as the latter is thrown on it by the rapid motion of the picker, that the fur will be drawn properly on the cone by the exhaust or suction within it.”
Now, “ an infringement involves substantial identity, whether that identity be described by the terms, ‘ same *573 principle/ same 1 modus operandi/ or any other. It is a copy of the thing described in the specification of the patentee, either without variation, or with such variations as are consistent with its being in substance the same thing. If the invention of the patentee be a machine, it will be infringed by a machine which incorporates in its structure and operation the substance of the invention; that is, by an arrangement of mechanism which performs the same service or produces the same effect in the same way, or substantially the same way.”*
No one who reads the two specifications, or inspects the two machines, can aver that they contain the same combination of mechanical devices, or substantially the same, to produce the desired effect. Not one of the devices, or its equivalent, used in the one is to be found in the other, nor is its mode of operation the same. The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect, is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term “ equivalent.” Without attempting to define this abstract term by other abstract terms, we may give examples which will best show its application to machines, as, where a simple lever is used in one, and the other substitutes a cam, or toggeljoint, or wedge for a cam, and many other cases where one mechanical power is substituted for another in a machine. In the ease of McCormick v. Talbot,† we have said: “If the invention claimed be itself but an improvement on a known machine by a mere change of form or combination of parts, the patentee cannot treat another as an infringer who has improved the original machine by use of a different form, or combination performing the same functions. ' The inventor of the first improvement cannot invoke the doctrine of equivalents to suppress all other improvements which are not colorable invasions of the first.”
But it has been argued, that though not a colorable invasion of the patentee’s claim, it is an evasion of his patent, *574 •which is equally injurious. If so, it is “ damnum, absque injuriaEvery man has a right to make an improvement in a machine, and evade a previous patent, provided he does not invade the rights of the patentee.
Now we are of opinion that the invention of Wells was a machine which was an improvement on the machines previously known. It is not founded on any new discovery of the application of any element or power of nature to produce an effect. He was not the first to devise the application of a vacuum to cones for the purpose of forming and compressing bats for hat-bodies, nor the first to discover that such bats should be made of unequal thickness, nor of pickers to distribute the fur from the carding apparatus. He has improved this machinery by his peculiar devices of brush, trunk, cap, flap, &e., combined in a machine which failed to be automatic till further improved. We are of opinion, also, that the specification of Wells correctly set forth the peculiar combination of devices in the machine he invented, that, as required by the statute, he truly and correctly stated the principle or mode of operation of his machine, and the functions performed by its several devices. There was no mistake in his specification by inadvertency or accident. He had a valid patent claiming his whole invention, — no more, no less.
But as the respondents are charged in the bill with infringement of a reissued patent, dated 3d December, 1860, and since the patent granted to Boyden, we must give it more special attention. It is true, we might dispose of it by saying, that as the machine of Boyden is not an infringement of the original invention of Wells, it cannot infringe the reissued patent if it be for the same invention, and if the reissued patent be not for the same invention, it is void.
Without aflirming or denying the charge of respondents, that this reissued patent is fraudulent as well as void, it will be proper more particularly to notice its history and contents.
The patent to Boyden was issued on the 10th of January, 1860. The complainants were invited to examine it. They *575 did so, accompanied by their counsel and other experts. After this, the complainants surrendered their valid patent, or rather its reissue of 1856, and have another reissue, which is now contended to have been made so elastic or expanded that it maybe used to suppress all other inventions which have been or may be made to effect the same purpose. The application for this reissue, as sworn to by one of the assignees, contains the following suggestion: “ That the aforesaid patent is not fully available to him, as assignee; that said error has arisen from inadvertence, accident, or mistake,” &c.
Previous to the Patent Act of 1836, which established a board or bureau composed of competent examiners, patents had frequently been adjudged invalid from the insufficiency of the specification; usually because, by inadvertency, accident, or mistake, the patentee had not sufficiently separated the old from the new, and had claimed more than he was entitled to. New inventors, or even learned lawyers, were capable of correctly and clearly setting forth in a specification the proper limits of the just claim of the invention. The thirteenth section was intended to remedy this evil, by permitting the patentee to surrender his defective patent, and have it renewed in proper form, “ whenever it shall be inoperative or invalid, by reason of a defective or insufficient description or specification, or by reason of the patentee claiming in his specification as his own, invention more than he had a right to claim as new, if the error has arisen by inadvertency, accident, or mistake,” &c.
Since the date of this act, not only the Patent Office but the bar can furnish gentlemen fully competent to the task of drawing up proper specifications, and but little liable to commit blunders from inadvertency. Specifications now seldom issue from the Patent Office to which such an imputation can be made. Nevertheless, this privilege of surrender and reissue is resorted to more frequently than ever. Formerly, when in course of investigation in a court of justice it was discovered that a patent was invalid for any of the reasons mentioned in the act, it was resorted to for protection. Now, after a patent has been declared to be valid, the specification *576 without defect, and the claim for nothing more than the invention, after it has undergone examination for many years, and courts and juries have decided that the patent is not invalid, through inadvertency, accident, or mistake, the assignees come forward and make oath, that the inventor’s original patent is “ unavailable” for some purpose unnecessary to be divulged. In the present case the purpose is transparent. The specification of this reissued patent, instead of describing first the machine and the several devices which exhibit its peculiar mode of operation in order to produce the desired effect, and stating what the patentee claims as his peculiar invention, commences by describing “ a mode of operation” as the thing intended to be patented, and uses these words: “ The said mode of operation, invented by the said Henry A. Wells, is embodied in the following description of the mode of application.” The claim is for the “ mode of operation, .substantially as herein described.”
We have no leisure for a further development of this novel form of patent, or how, by the use of general and abstract terms, the specification is made so elastic that it may be construed to claim only the machine, or so expanded as to include all previous or future inventions for the same purpose.
Morse was certainly the first who successfully applied the element of electro-magnetism to telegraphing. By the eighth claim of his reissued patent he claimed “ not the specific machine described, but the use of the motive power of the galvanic current however developed for printing signs or letters at a distance, being a new application of that power of which he was the first discoverer.”
On which this court remark,* “ It is impossible to misunderstand the extent of this claim, if it be maintained, it matters not by what process or machinery the result is accomplished. Another may possibly discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in plaintiff’s specification. Yet if it is covered *577 by this patent the inventor could not use it, nor the public have the benefit of it, &e. The court is of opinion it is too broad and not warranted by law.”
In this case we have an attempt to convert an improved machine into an abstraction, a principle or mode of operation, or a still more vague and indefinite entity often resorted to in argument, an “ idea.” Those who use the latter term seem to have no fixed idea of what they mean by it. But it may be used as successfully to mystify a plain matter as the words used in the specification.
The Patent Bureau in this country is composed of men of scientific attainments, who examine the merits of every claimant of a patent, and decide whether in their opinion it attempts to claim a monopoly of things before known or invented. They are not expected, as formerly, to grant a patent without inquiring, to every applicant who is ready to pay the fees. Such a course of conduct would be highly injurious to the public, by furnishing means to impose on the public by false pretences, and with threats of expensive and ruinous litigation.
The surrender of valid patents, and the granting of reissued patents thereon, with expanded or equivocal claims, where the original was clearly neither “ inoperative nor invalid,” and whose specification is neither “ defective or insufficient,” is a great abuse of the privilege granted by the statute, and productive of great injury to the public. This privilege was not given to the patentee or his assignee in order that the patent may be rendered more elastic or expansive, and therefore more “ available” for the suppression of all other inventions.
We concur, therefore, in the decision of the Circuit Court, that the machine of Boy den is not an infringement of the invention of Wells; and if it be an infringement of the reissued patent, that patent is void.
2. The bill claims, also, for an infringement of Wells’s reissued patent for his process. This has not been much insisted on. The respondents contend that it is void, being for the same invention patented to Ponsford, in England, in *578 1839, and known to Wells, who was at the time in England. This allegation we find to be fully supported by tlie evidence, and decide accordingly.
Decree aeeirmed with costs.
Note.
At tbe same time with tbe preceding cases, or rather immediately afterwards, two other cases, appeals from the New Jersey district, between the same parties and relating to the same general subject of hat-bodies, were heard; the same counsel who had argued the first and principal case, arguing these two also; though not at length, as from the fact already mentioned, to wit, that the principles involved were the same, it was understood that the decision of these two would follow the decision of the first and principal case. The first of these two cases decided simply a point of fact, to wit, that the machine known as the “ Boyden machine,” and so largely discussed in the principal case, was not an infi’ingement of a patent granted in the same department of manufacture to a certain Hopkins: no reasons being assigned; Grier, J.,who delivered the opinion of the court, remarking that, while their honors had come to a conclusion satisfactory to their own minds, it was impracticable to “ vindicate” it without the use of the “ large museum of exhibits in the shape of machines and models” which had been presented on the argument of all these three cases, and which “were absolutely necessary to give the court a proper understanding of the merits of the controversy.” The result, therefore, was stated; the curious being referred for reasons to those given by the defendant’s witness, Mr. Tredwell, examined in the case. This decree, too, was affirmed with costs.
The other of the two cases admits of a certain kind of report, now given, as on the three pages which follow.

 1 Howard, 202.

 Curtis on Patents, 322.

 20 Howard, 405.

 O’Reilly v. Morse, 15 Howard, 112.